United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES RAMSEY,<br>Plaintiff,<br>v.<br>COMMISSIONER OF SOCIAL SECURITY,<br>Defendant. | Civil No. 3:25-cv-04032-RS<br><br>**ORDER AFFIRMING ALJ DECISION** |

## I. INTRODUCTION

Plaintiff James Ramsey appeals the decision of the Commissioner of Social Security denying him supplemental security income ("SSI") benefits under the Social Security Act ("SSA"). An Administrative Law Judge ("ALJ") reviewed Ramsey's application and determined he was not disabled and thus not eligible for benefits. Ramsey seeks reversal of the Commissioner's final decision and remand for award of benefits. Because substantial evidence supports the ALJ's findings and there was no harmful legal error, the ALJ's decision is affirmed.

## II. BACKGROUND

James Ramsey is a twenty-five-year-old with a high school education. Dkt. No. 8 at 38. Growing up, he was on disability benefits. Dkt. No. 9 at 3304, 3321-22. Ramsey claimed that, when he was eight, he started hearing voices. *Id.* at 3303. After turning eighteen, Ramsey's disability benefits ended. *Id.* at 3304, 3321-22. He began using methamphetamines after turning

twenty, *id.*, and has struggled with incarceration, homelessness, and unemployment, *id.* at 3303-05.

In November 2020, Ramsey filed an application for SSI, alleging disability beginning in September 2013. Dkt. No. 8 at 19. He claimed bipolar disorder, schizo-affective disorder, and asthma. Dkt. No. 8 at 98.

The claim was denied initially in May 2021, *id.*, and upon reconsideration in October 2021, *id.* at 105. Subsequently, Ramsey filed a written request for a hearing. *Id.* at 111. The hearing was eventually held in January 2024 with Ramsey, his attorney, and an impartial vocational expert attending via telephone. Dkt. No. 9 at 3298.

**A. The Administrative Hearing**

Ramsey testified that he last worked in 2020. *Id.* at 3303. He lasted for "[a] couple [of] weeks," *id.* at 3304, and his employment was "off and on," *id.* at 3305. He attributed his unemployment to his inability to stay focused, "lack of sleep," and "not being able to keep up with the job." *Id.* at 3304-05. His lack of sleep and focus caused him to miss work and, when he did turn up, leave early. *Id.* at 3305. He claimed that these issues were due to the voices, *id.* at 3306 ("it's hard for me to sleep because of nonstop chatter with different voices"), and not the result of his drug use, *id.* at 3305 ("Q: …Do you believe that the drugs are causing the voices? A: No").

Ramsey testified that he started hearing voices when he was eight. *Id.* at 3303. The voices mostly came at night and interfered with his sleep. *Id.* at 3306. Sometimes the voices told Ramsey to bang his head; sometimes he banged his head to get the voices to stop. *Id.* at 3307. As the voices can be "really loud," *id.*, Ramsey "g[o]t overwhelmed" at times, *id.* at 3312. He testified that he would seek "immediate therapy" by "go[ing] suicidal" so that he could "have a nurse or a therapist [he] could talk to and… calm [him] down." *Id.*

Ramsey also testified that he was easily agitated because he was "bipolar schizoaffective" and had "mood swings… since [he] was 8 years old." *Id.* at 3307. He claimed the problem was further exacerbated by the voices. *Id.* at 3306 ("it makes me agitated because I can't get [the

voices] out of my head"). Although he was on medication, *id.* at 3309, Ramsey attested to being unable to control himself even when on his medication, *id.* at 3310 ("Q: …while you're inside jail and you've had your medicine you've still had incidences where you haven't been able to control yourself. Is that right? A: Correct"). However, he noted that "with [the medication, he has] a lot of days where [he's] balanced" to the extent that he could "take care of [himself] in a job." *Id.* at 3319.

Ramsey claimed that the agitation caused by the voices led him to take drugs. *Id.* at 3315 ("most days I'm paranoid or feeling agitated… that's the reason why I actually got on crystal meth… I was able to tune [the voices] out better when I was high"). It also led him to threaten the safety of people around him. *See, e.g.*, *id.* at 3316-17 (stating that he would "make a terrorist threat or make a criminal threat to someone" to cope with his agitation and inability to sleep). In one instance, his condition caused him to kick an elderly woman and led to his incarceration. *Id.* at 3308-09, 3315.

According to Ramsey, even while on medication, he would sometimes lose control over his actions and bang his head. Id. at 3310-11. For instance, he recounted an incident when, while incarcerated, he asked for extra food, but the guard declined; he then banged his head on the door and claimed he was suicidal. *Id.* at 3310. The guard then moved him to a safety cell. *Id*. While he acknowledged that his request for more food "won't help [with] the voices," *id.*, Ramsey asserted that he "[felt] like wanting to hurt [himself]" and had "no control," *id.* at 3311.

### B. ALJ's Determination

#### 1. Physical Impairments

Ramsey submitted treatment records related to his claimed physical impairments. Dkt. No. 8 at 20. The ALJ found that the records, along with medical opinions from State agency consultants Drs. Acinas and Wang, were "consistent with non-severe physical impairments." *Id.* at 24. Specifically, the ALJ noted that "the record lacks documentation of acute exacerbations of asthma" and so did not support Ramsey's claim of severe asthma. *Id.* at 22.

The record shows Ramsey was also seen for other physical conditions, notably, right foot pain, back pain with sciatica, headaches, and past head trauma. *Id.* at 22-23. However, the ALJ determined that the record does not establish that these conditions were severe – for example, because Ramsey seemingly got better, *e.g.*, *id.* at 22 (stating that Ramsey was seen for right foot pain in November 2020 but "[a] December exam noted normal gait and intact muscle strength"), or a lack of severity, *e.g.*, *id.* at 23 ("there has been quite minimal discussion of headaches, and just a few visits for headaches spread throughout the record"). The ALJ concluded that Ramsey's physical impairments "are no more than non-severe." *Id.* at 24.

**2. Mental Impairments**

The ALJ concluded that Ramsey's claimed mental impairments, "considered singly and in combination, do not meet or medically equal the criteria of listings 12.03, 12.04, 12.06… 12.11 and 12.15." *Id.* The ALJ determined that treatment records supported "diagnoses of psychotic, impulse control and trauma-related disorders… [and] indication of an amphetamine use disorder" prior to the protective filing date. *Id.* at 29. After the protective filing date, treatment records show that Ramsey would sometimes have "pressured speech, racing thoughts and mild agitation," but at other times, he would be "ok aside from hearing voices" or "irritable but with grossly intact cognition." *Id*. Overall, treatment records supported the conclusion that Ramsey was "no more than moderately limited with respect to mental functioning." *Id.* at 29-30.

The ALJ also noted that several treatment records reflected suspicion of malingering. *See, e.g.*, *id.* at 29 ("there was high suspicion of malingering"), 30 ("There was also note of malingering behavior with desire to gain resources"), 31 ("the claimant also admitted that he had been dishonest about having suicidal thoughts just to obtain a quiet place to detox"), 32 ("malingering has been suspected and, at times, noted, exaggeration has been noted and the claimant has made some admission of endorsing self-harm to obtain certain housing"), 33 ("[Ramsey] also alleged that suicidal ideations were made as an effort to avoid the cage setting, another admission of a volitional component to his reported symptoms"), 34 ("there have been a

number of admissions that he engaged in behavior issues and[/]or threats for personal reasons, such as to obtain food or certain housing, suggesting some volitional component to his behavior" and "[Ramsey] admitted falsely claiming suicidal thoughts to get out of his cell, as he was not getting along with his cellmate"). Overall, "the record has noted malingering and exaggeration of symptoms." *Id.* at 34.

#### 3. ALJ's Conclusion

The ALJ stated that, despite Ramsey's mental health symptoms and instances of acting out, his periods of psychiatric hospitalization were "quiet [sic] brief." *Id*. The record supported only "moderate mental limitations." *Id*. This, coupled with the noted malingering, led the ALJ to conclude that Ramsey had the residual functional capacity ("RFC") to "perform a full range of work at all exertional levels" with some limitations. *Id.* at 26. Since jobs matching this RFC were available in significant numbers in the national economy, the ALJ found that Ramsey was not disabled. *Id.* at 38.

### C. This Action

In May 2025, Ramsey commenced this action seeking judicial review of the ALJ's decision. He asks for a reversal and a remand for an immediate award of benefits. Dkt. No. 13 at 15. Alternatively, he seeks a remand for further administrative proceedings. *Id*. The Commissioner seeks to affirm the ALJ's decision. Dkt. No. 16 at 6.

## III. LEGAL STANDARD

The SSA authorizes judicial review of final decisions made by the Commissioner. 42 U.S.C. § 405(g). "Th[e] court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations

omitted). In other words, if the ALJ decision is supported by substantial evidence and there is no legal error, the district court will affirm.

Substantial evidence is evidence in the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla but less than a preponderance." *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995) (per curiam). The court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted). If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).

Legal error is the application of "improper legal standards." *Stone v. Heckler*, 761 F.2d 530, 531 (9th Cir. 1985). To reject medical evidence, the proper legal standard requires the ALJ to provide "an explanation supported by substantial evidence." *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022). That is, the ALJ "must 'articulate… how persuasive' it finds 'all the medical opinions' from each doctor or other source, and 'explain how [it] considered the supportability and consistency factors' in reaching these findings." *Id.*

To reject a claimant's testimony, the proper legal standard requires a two-step analysis. *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014). First, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). Then, if there is no evidence of malingering, the ALJ must provide "specific, clear and convincing" reasons for rejecting the claimant's testimony." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).

To reject a lay witness's testimony, the ALJ must provide "reasons germane to each witness." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's

error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and quotation marks omitted).

If there is a legal error or a lack of substantial evidence, the SSA permits the district court to affirm, modify, or reverse the ALJ's decision "with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see also Garrison*, 759 F.3d at 1019. "[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (internal quotations and citations omitted). Under the credit-as-true rule, however, a court may order an immediate award of benefits if three conditions are met: (1) the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion, (2) there are no outstanding issues that must be resolved before a disability determination can be made and further administrative proceedings would serve no useful purpose, and (3) when considering the record as a whole and crediting the improperly discounted testimony as true, there is no doubt as to disability. *See Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017). Even if all three criteria are met, the decision to remand for an award of benefits or remand for further proceedings is within the district court's discretion. *Id.*

## IV. DISCUSSION

Ramsey seeks a reversal and a remand for an immediate award of benefits. Dkt. No. 13 at 15. He contends that the ALJ erroneously rejected his testimony because "the ALJ failed to provide clear and convincing reasons for finding Plaintiff's statements to be inconsistent with the medical evidence." *Id.* at 7. He also argues that the ALJ cherry-picked "a tiny handful of pages in the nearly three-thousand-page medical record" to find Plaintiff had only moderate limitations. *Id.* at 10-12. Finally, Ramsey claims that the ALJ's RFC determination was "incompatible with any fair review of the medical records." *Id.* at 13-14. Alternatively, Ramsey seeks remand for further administrative proceedings. *Id.* at 15.

The Commissioner's position is that the "ALJ need not provide justification for an adverse credibility finding where there is affirmative evidence of malingering." Dkt. No. 16 at 2. The

Commissioner seeks to affirm the ALJ's decision. *Id.* at 6. Ramsey replies that "malingering on its own is not… sufficient to support an adverse finding regarding a claimant's testimony" because a claimant's testimony is not about the claimant's credibility but about the "intensity and persistence of [his] symptoms." Dkt. No. 17 at 3-4.

**A. Ramsey's Argument That the ALJ Improperly Rejected his Testimony**

The ALJ did not err in rejecting Ramsey's testimony. "An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible." *Garrison*, 759 F.3d at 1014. At the first step, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter*, 504 F.3d at 1035-36 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). The claimant is not required to show "that her impairment could reasonably be expected to cause the severity of the symptoms she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). The claimant is also not required to provide "objective medical evidence of the pain or fatigue itself, or the severity thereof." *Id.* (citation omitted).

If the claimant satisfies the first step of this analysis, and "[u]nless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be 'clear and convincing.'" *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). To meet the clear and convincing standard, the ALJ "must state which pain testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). "He must either accept claimant's testimony or make specific findings rejecting it." *Id.* "The only time [the clear and convincing] standard does not apply is when there is affirmative evidence that the claimant is malingering." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008).

United States District Court
Northern District of California

**1. Malingering**

Here, in step two, the ALJ rejected Ramsey's testimony due to malingering. Dkt. No. 8 at 34 ("Yet, while there have been assertions that such behavior and threat issues were due to hearing voices, anxiety and/or agitation, there have also been a number of admissions that such behavior and/or threats were intended for the purpose of obtaining a desire want such as food or specific housing."). The ALJ cites several medical opinions to support his determination of malingering. For instance, the ALJ relies on medical opinions of Dr. Kory Combs of John George Psychiatric Hospital and Dr. Amy Yang of San Leandro Hospital. *Id.* at 29 ("there was high suspicion of malingering") (citing Ex. 4F/94), 30 ("There was also note of malingering behavior with desire to gain resources.") (citing Ex. 4F/80).

Ex. 4F/94 is an assessment by Dr. Kory Combs dated November 2020. The ALJ used Ex. 4F/94 as an example of malingering with respect to Ramsey's claims of hearing voices or auditory hallucinations ("AH"). *Id.* at 29. Dr. Combs wrote in his treatment notes that Ramsey came to the lobby, "stating that he [wa]s having AH and hoping to come in to get medications." *Id.* at 1310. Dr. Combs noted that there was "[s]ome suspicion of **malingering** in that he had visited… only 2 hours before… wanting to refill albuterol inhaler and then tried to get a housing voucher." *Id.* (emphasis in original); *see also id.* at 1311 ("Though the patient is [complaining of] AH, there is a high suspicion for **malingering** given above information in [history of present illness].") (emphasis in original).

Ex. 4F/80 is an assessment by Dr. Amy Yang dated November 2020. The ALJ used Ex. 4F/80 as an example of malingering with respect to Ramsey's claims of suicide ideation ("SI"). *Id.* at 29-30. Dr. Yang stated in her treatment notes that Ramsey complained of "having hallucinations and feeling kinda [sic] suicidal." *Id.* at 1296. Her assessment was "Malingering behavior with desire to gain resources which have been provided." *Id.* (emphasis in original).

These are just two – out of several – pieces of evidence that the ALJ relied on to find malingering. The weight of the evidence constitutes "affirmative evidence that the claimant is malingering." *Carmickle*, 533 F.3d at 1160. Despite Ramsey's argument to the contrary, Ninth

Circuit precedent instructs that the clear and convincing standard does not apply when there is affirmative evidence of malingering. *Carmickle*, 533 F.3d at 1160 ("The only time [the clear and convincing] standard does not apply is when there is affirmative evidence that the claimant is malingering."); *see also Schow v. Astrue*, 272 F. App'x 647, 651 (9th Cir. 2008) ("the weight of [Ninth Circuit] cases hold that the mere existence of 'affirmative evidence *suggesting*' malingering vitiates the clear and convincing standard of review") (emphasis added).

As there is affirmative evidence of malingering, the ALJ did not err in rejecting Ramsey's testimony. Ramsey's first argument that "the ALJ failed to provide clear and convincing reasons for [rejecting his testimony]" fails. Dkt. No. 13 at 7.

**2. Substantial Evidence**

Ramsey's alternative argument that, "even if the 'clear and convincing' standard is found not to apply in this case… the ALJ was still required to provide reasons for his finding that [his] testimony was inconsistent with the medical records," Dkt. No. 17 at 4, is also unavailing. Substantial evidence requires only "more than a mere scintilla [of evidence] but less than a preponderance." *Moncada*, 60 F.3d at 523. If the evidence could "reasonably support either affirming or reversing the Commissioner's decision, [the court] may not substitute its judgment for that of the Commissioner" and must affirm. *Jamerson*, 112 F.3d at 1066.

Here, as discussed above, the ALJ cited multiple pieces of medical evidence for his determination of malingering. *See* Dkt. No. 8 at 29-34. These meet the standard of "more than a mere scintilla." *Moncada*, 60 F.3d at 523.

Regarding the issue whether the evidence could "reasonably support either affirming or reversing the Commissioner's decision," *Jamerson*, 112 F.3d at 1066, the evidence here could reasonably support the ALJ's decision. Consider, for instance, Ramsey's claims that he would feel suicidal when he asked for an extra lunch but was denied. Dkt. No. 9 at 3310. Ramsey testified that he would bang his head because of the voices and not because of his auditory hallucinations. *Id.* ("I was suicidal because the voices wouldn't stop leaving me alone… the deputy said, well if I

get you a lunch would that help? I'm like, no, it'll help the hunger but it won't help the voices"). The ALJ, however, cited treatment notes in Exhibit 21F. Dkt. No. 8 at 33. There, Dr. Maria Langi recorded that "[t]he deputy said [Ramsey] did not make any other statements besides 'I'm suicidal,' but that [Ramsey] often does this for extra lunches." *Id.* at 3034. Dr. Langi then quoted Ramsey, who said, "I have been *manipulative* on the HU [Housing Unit], I want more food. So today, I couldn't get more food, I got anxious and agitated. Then I started hitting my head." *Id.* (emphasis added). In other words, while Ramsey testified that he hit his head because of the voices and not because he wanted more food, he admitted to Dr. Langi that he hit his head because he wanted more food.

Understood in the context of several instances suggesting malingering, *see, e.g.*, 1296, 1310-11, Ramsey's admission to Dr. Langi could reasonably support the ALJ's finding that Ramsey was malingering in that instance. The evidence could "reasonably support either affirming or reversing the Commissioner's decision," *Jamerson*, 112 F.3d at 1066, and so, the substantial evidence standard is met.

**3. Malingering as Symptoms of Ramsey's Condition**

Ramsey also argues that "these instances of apparent malingering do not undermine Plaintiff's testimony about his mental health impairments. In fact, these instances of malingering are best understood as symptoms of his condition." Dkt. No. 13 at 7; *see also* Dkt. No. 17 at 3. In other words, Ramsey argues that he was malingering *because* he had mental health conditions. Ramsey relies on *Carr v. Astrue*, 2009 WL 3112400 (E.D. Cal. September 22, 2009) and *Davis v. Astrue*, 444 F. App'x 151 (9th Cir. 2011).

Neither *Carr* nor *Davis* helps Ramsey. The *Carr* court found that the ALJ decision was not supported by substantial evidence despite evidence of malingering. 2009 WL 3112400 at *8. This is because that claimant "suffered from significant social limitations that were caused by a documented, and *separate*, mental disorder," which that ALJ "fails to discuss." *Id.* (emphasis added). That is, the *Carr* claimant had a separate mental condition that was distinct from her

instances of malingering. In contrast, here, Ramsey's claimed mental condition is not distinct from his instances of malingering. Ramsey testified that he could not work due to his inability to stay focused, "lack of sleep," and "not being able to keep up with the job." Dkt. No. 9 at 3304-05. This, in turn, was caused by hearing voices. *Id.* at 3306 ("it's hard for me to sleep because of nonstop chatter with different voices"). Ramsey's instances of malingering were related to his claims of hearing voices. *See, e.g.*, Dkt. No. 8 at 3072 (treatment notes of Dr. Laura Naman stating that Ramsey complained of "hearing things and seeing things" but determining after a 24-hour observation that Ramsey "was mainly motivated by housing, and that he was exaggerating any psychotic symptoms he was endorsing"). Ramsey's reliance on *Carr* is hence misplaced.

Ramsey cites *Davis* for the proposition that malingering could be a symptom of an underlying disabling condition, and that Ramsey may be rendered disabled based on that underlying disability. Dkt. No. 17 at 3. In *Davis*, the ALJ improperly rejected the testimony of Dr. Cools, who "apparently accepted the exaggerated symptoms without question despite repeated references in the record to symptom magnification and malingering." 444 F. App'x at 152. The *Davis* court held that Dr. Cools "did not improperly ignore the evidence of malingering" so the ALJ erred in rejecting Dr. Cools's testimony. *Id*. This case differs from *Davis* in several ways. First, *Davis* does not apply to Ramsey's testimony because the holding in *Davis* is about the rejection of medical evidence as opposed to rejection of claimant's testimony.[1] Second, unlike the *Davis* claimant, Ramsey did not produce medical evidence that "specifically noted the extensive evidence of malingering and exaggeration and discussed how they complicate [the claimant's] diagnosis." 444 F. App'x at 152. *Davis* does not help Ramsey.

In sum, because the ALJ provided affirmative evidence suggesting malingering, clear and

---

[1] Moreover, *Davis* applies only to claims filed before 2017, when rules for evaluating medical opinion evidence changed. Pre-2017, the ALJ needed to distinguish between treating physicians, examining physicians, and non-examining physicians; this is no longer the case. *See Ortiz v. Bisignano*, 179 F.4th 691, 698 (9th Cir. 2026).

convincing evidence is not required. The evidence the ALJ cited also meets the substantial evidence standard. Thus, the ALJ did not err in rejecting Ramsey's testimony.

**B. Ramsey's Argument that the ALJ Cherry-picked Medical Testimony**

The ALJ did not cherry-pick medical testimony. If the ALJ decision is supported by substantial evidence and there is no legal error, the district court must affirm. *Tackett*, 180 F.3d at 1097. To meet the substantial evidence standard, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins*, 466 F.3d at 882. The ALJ may not "'cherry-pick' from mixed results to support a denial of benefits." *Garrison*, 759 F.3d at 1017 n.23.

Ramsey argues, "in finding only a moderate impairment in understanding, remembering or applying information… the ALJ cited to only a tiny handful of pages in the nearly three-thousand-page medical record." Dkt. No. 13 at 10. This characterization is not accurate. The ALJ first acknowledges Ramsey's claimed mental disorders, citing Exhibits 1F (treatment records), 7F (medical report), 14F (medical report), 22F (hospital records), 27F (San Francisco Jail treatment records), and Ramsey's testimony. Dkt. No. 8 at 24. The ALJ then turns to evidence that undermine Ramsey's claims – Exhibits 4F (medical report), 5F (treatment records), 7F (medical report), 22F (hospital records), and 27F (San Francisco Jail treatment records). *Id*. The ALJ considered a variety of medical opinion and Ramsey's testimony to come to his determination – this is hardly cherry-picking evidence.

**C. Ramsey's Argument Regarding RFC Determination**

Ramsey's final argument is also futile because it is premised on a strained reading of the ALJ's decision. According to Ramsey, in finding that he could perform "a full range of work at all exertional levels" with some limitations, the ALJ failed to account for Ramsey showing up late for work and being off-task as a result of his impairments. Dkt. No. 13 at 13. Ramsey contends that, "[h]ad the ALJ properly considered the overall record, he would have been required to find that

United States District Court
Northern District of California

Plaintiff's impairments prevent him from meeting the basic mental demands of unskilled work on a sustained basis." *Id*.

While the ALJ did find that Ramsey could perform a full range of work at all exertional levels with some limitations, the ALJ's decision was premised on his determination that Ramsey was malingering. In the RFC determination, the ALJ first acknowledged that Ramsey had "many behavioral incidents (head banging especially) and threats of suicide," Dkt. No. 8 at 34, and discussed Ramsey's medical history in detail, *id.* at 27-34. The ALJ balanced these incidents and threats, however, against "many observations of calm, polite demeanor with intact/adequate impulse control" and the fact that "the record has noted malingering and exaggeration of symptoms." *Id.* at 34. Specific to absenteeism issues, the ALJ determined the record did not support a limitation, noting that "[w]hile there have been many symptoms alleged… there have also been notes of malingering, exaggeration and admissions of making threats to obtain a desired want, such as food or housing." *Id.* at 35.

It is not that the ALJ did not account for Ramsey's absenteeism or impairments, as Ramsey claims, but rather those impairments and absenteeism were undermined in the RFC determination by ALJ's finding of malingering. *Id.* (concluding that "the claimant possesses the ability to engage in full-time work activities, *at least if so motivated*") (emphasis added). Ramsey's claim that the ALJ failed to account for his absenteeism and impairments fails.

## V. CONCLUSION

For the reasons set forth above, ALJ's decision is affirmed.

**IT IS SO ORDERED.**

Dated: September 29, 2026

RICHARD SEEBORG
United States District Judge